1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

MARK BERGER, CANDACE DELEO, LORI BLANCHARD, JEFF BLANCHARD, JOHN BURKE, DIANE BURKE, MIAH EBEL, JOHN FELTIS, ISAAC FRAUSTO, NINA FRAUSTO, DANIELLE HARRINGTON, TYREL HAVEMAN, BEVERLY HOBACK, ROGER JOHNSON, LEI ANN JOHNSON, JAMES LAMBETH, CHRIS LAU, BRUCE LINDSTROM, HEIDI ENGLE, ANDREW MARTIN, KRYSTAL LIPP-MARTIN, MICHAEL MARTONICK, LISABETH MARTONICK, CAMERON MEIER, CAITLYN MEIER, ROBERT MENDEL, ZACHARY MENDEL, TONI MILLER, JACOB RILEY POLARIS, VICTOR RENZ, CONSTANCE RENZ, DOROTHY SPRING, SHELLEE STRATTON, KERRY STRICKLAND, GRAYDON STRONG, AND DEVA SUNKARA

                    Plaintiffs,

    vs.

GENERAL MOTORS, LLC,

                    Defendant.

No.

**PLAINTIFFS' ORIGINAL COMPLAINT**

<u>JURY DEMAND</u>

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Mark Berger, Candace DeLeo, Lori Blanchard, Jeff Blanchard, John Burke, Diane Burke, Miah Ebel, John Feltis, Isaac Frausto, Nina Frausto, Danielle Harrington, Tyrel Haveman, Beverly Hoback, Roger Johnson, Lei Ann Johnson, James Lambeth, Chris Lau, Bruce Lindstrom, Heidi Engle, Andrew Martin, Krystal Lipp-Martin, Michael Martonick, Lisabeth Martonick, Cameron Meier, Caitlyn Meier, Robert Mendel, Zachary Mendel, Toni Miller, Jacob Riley Polaris, Victor Renz, Constance Renz, Dorothy Spring, Shellee Stratton, Kerry Strickland, Graydon Strong, and Deva Sunkara ("Plaintiffs") file Plaintiffs' Original Complaint complaining of General Motors, LLC ("GM" or "Defendant") and respectfully show the Court as follows:

### I.     <u>PARTIES</u>

#### <u>Plaintiffs</u>

1.     Plaintiffs Mark Berger and Candace DeLeo are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S07L4105112 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

2.     Plaintiffs Lori Blanchard and Jeff Blanchard are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S08L4146252 in the



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

3.     Plaintiffs John Burke and Diane Burke are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S03L4135043 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

4.     Plaintiff Miah Ebel is a citizen of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S03L4113320 and a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S08L4115726 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

5.     Plaintiff John Feltis is a citizen of the State of Washington who acquired a 2018

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1     Chevrolet Bolt bearing VIN 1G1FX6S00J4110071 in the State of Washington. At the time of

2     the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had

3     Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle

4     or would have paid substantially less for it.  Because Plaintiff was unaware of the defective

5     nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the

6     time of the acquisition and suffered incidental, consequential and actual damages after the

7     vehicle's acquisition.

8            6.     Plaintiffs Isaac Frausto and Nina Frausto are citizens of the State of Washington

9     who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FZ6S00M4114426 in the State of

10    Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its

11    battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would

12    not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs

13    were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered

14    overpayment damages at the time of the acquisition and suffered incidental, consequential and

15    actual damages after the vehicle's acquisition.

16           7.     Plaintiff Danielle Harrington is a citizen of the State of Washington who

17    acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S00L4140235 in the State of Washington.

18    At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were

19    defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have

20    acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware

21    of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment

22    damages at the time of the acquisition and suffered incidental, consequential and actual

23    damages after the vehicle's acquisition.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

8.      Plaintiff Tyrel Haveman is a citizen of the State of Washington who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FW6S05H4175611 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

9.      Plaintiff Beverly Hoback is a citizen of the State of Washington who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FX6S01N4106181 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

10.     Plaintiffs Roger Johnson and Lei Ann Johnson are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FX6S08L4137277 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

11.     Plaintiff James Lambeth is a citizen of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FZ6S0XM4105216 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

12.     Plaintiff Chris Lau is a citizen of the State of Washington who acquired a 2019 Chevrolet Bolt bearing VIN 1G1FY6S03K4145637 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

13.     Plaintiffs Bruce Lindstrom and Heidi Engle are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S06L4145937 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

14.    Plaintiffs Andrew Martin and Krystal Lipp-Martin are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S07L4130771 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

15.    Plaintiffs Michael Martonick and Lisabeth Martonick are citizens of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FZ6S02M4105744 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

16.    Plaintiffs Cameron Meier and Caitlyn Meier are citizens of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FZ6S02M4101032 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

17.     Plaintiffs Robert Mendel and Zachary Mendel are citizens of the State of Washington who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FX6S03H4184093 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

18.     Plaintiff Toni Miller is a citizen of the State of Washington who acquired a 2018 Chevrolet Bolt bearing VIN 1G1FX6S03J4117368 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

19.     Plaintiff Jacob Riley Polaris is a citizen of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FY6S00M4111254 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.

PLAINTIFFS' COMPLAINT - Page 8



701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

20.     Plaintiffs Victor Renz and Constance Renz are citizens of the State of Washington who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S08L4116925 in the State of Washington. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

21.     Plaintiff Dorothy Spring is a citizen of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FY6S05M4113968 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

22.     Plaintiff Shellee Stratton is a citizen of the State of Washington who acquired a 2018 Chevrolet Bolt bearing VIN 1G1FX6S04J4112762 in the State of Washington. At the


PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1    time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.

2    Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the

3    vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the

4    defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages

5    at the time of the acquisition and suffered incidental, consequential and actual damages after

6    the vehicle's acquisition.

7

8        23.    Plaintiff Kerry Strickland is a citizen of the State of Washington who acquired

9    a 2021 Chevrolet Bolt bearing VIN 1G1FY6S05M4111654 in the State of Washington. At the

10    time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.

11    Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the

12    vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the

13    defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages

14    at the time of the acquisition and suffered incidental, consequential and actual damages after

15    the vehicle's acquisition.

16

17        24.    Plaintiff Graydon Strong is a citizen of the State of California who acquired a

18    2022 Chevrolet Bolt bearing VIN 1G1FX6S01N4116533 in the State of Washington. At the

19    time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.

20    Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the

21    vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the

22    defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages

23    at the time of the acquisition and suffered incidental, consequential and actual damages after

24    the vehicle's acquisition.

25

26

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

25.     Plaintiff Deva Sunkara is a citizen of the State of Washington who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FZ6S04M4105132 in the State of Washington. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

**Defendant**

26.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business in Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings, LLC, which is also a Delaware limited liability company with its principal place of business in Michigan. The sole member of General Motors Holdings, LLC is General Motors Company, a corporation organized under the laws of Delaware with its principal place of business in Michigan.  Therefore, General Motors, LLC ("GM") is a citizen of the states of Delaware and Michigan.

## II.     VENUE AND JURISDICTION

27.     The Court has diversity jurisdiction because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000 for each Plaintiff exclusive of interest and costs.  GM is a corporation organized, doing business, and existing under the laws of Delaware with its principal place of business in Michigan.

28.     This Court also has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131. The



701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1   amount in controversy exceeds $50,000 (exclusive of interest and costs) computed on the basis

2   of all claims to be determined in this suit.  The amount of any individual claim of any individual

3   plaintiff is not less than the sum or value of $25.00.  The Court has supplemental jurisdiction

4   over Plaintiffs' state law claims under 28 U.S.C. § 1367.

5       29.    This Court has personal jurisdiction over GM because a substantial part of the

6   events, omissions, or misrepresentations giving rise to these claims occurred in and emanated

7   from this District.

8       30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a

9   substantial part of the events, transactions, and conduct giving rise to the claims occurred in

10  and emanated from this District.

### III.   FACTS

11      31.    GM markets and sells the Chevrolet Bolt, a front-motor, five-door, all-electric,

12  plug-in hatchback. This action arises out of GM's failure to disclose and then adequately repair

13  a uniform and widespread defect in the 60 kWh 350  V lithium-ion battery (hereinafter the

14  "Defective Battery") in the Chevrolet Bolt that has led to numerous safety recalls and guidance

15  from GM that imposes highly restrictive limitations on consumers' use of the vehicles. The

16  defect causes the high voltage battery to overheat when charged to full or nearly full capacity,

17  which can result in  catastrophic and destructive fires, resulting in an unreasonable safety risk to

18  the drivers  and passengers of vehicles equipped with the Defective Battery. These vehicles

19  (hereinafter "Defective Vehicles" or "Vehicles") are the 2017–22 model year Chevrolet Bolt

20  EVs and 2002 Chevrolet Bolt EUVs (hereinafter "Chevy Bolt" or "Bolt").

### A.    Development and Production of the Defective Vehicles.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

32.    GM introduced the Chevy Bolt EV concept in the 2015 Detroit Auto Show and presented it as "a vision for an affordable, long-range all-electric vehicle designed to offer more than 200 miles of range starting around $30,000."

33.    On January 6, 2016, General Motors Chair and CEO Mary Barra formally unveiled the 2017 Chevy Bolt and touted the Vehicle's 200-plus mile range and comparatively low charging time required to reach 80 percent capacity, noting that "the Bolt EV can actually give you time back." Highlighting their EV experience derived from the similarly named Chevy Volt, GM partnered with Korean supplier LG Corporation and its Korean and American subsidiaries to develop and manufacture "an all-new cell and battery pack to offer more than an estimated 200 miles of range."

34.    The Bolt was GM's version of an all-electric vehicle, competing with emerging all-electric vehicle lines promoted by new market entrants like Tesla, Nissan, and BMW. It quickly garnered a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, 2017 Green Car of the Year, and Automobile Magazine 2017 All Star awards. These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]." Green Car Reports stated that the "most important thing about the Bolt EV" was "how far you can go on a single charge," noting that the 2017 Bolt offered "the range of a Tesla, for roughly half the price." The Bolt was lauded as "the 200-mile-range EV with cool connectivity that people can actually afford."

35.    Range is a key consideration for purchasers and lessees of electric vehicles. It takes substantially longer to charge an electric vehicle than it does to fill up a tank of gas, and a fully charged electric vehicle cannot travel as far on a single charge as most gas-powered



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

vehicles can travel on a full tank of gas. The impressive range of the Bolt was advertised as being the result of an "unprecedented" partnership between Defendant GM and LG.

**B.    Defendants' Marketing to Defective Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt.**

36.    Range is critical to the success of an all-electric vehicle. Car and Driver Magazine describes range as "the all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel" and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station." Because battery charging takes more time than refilling a gasoline tank, an all-electric vehicle's usefulness is directly related to the distance the automobile can travel before needing a recharge. Therefore, electric car buyers particularly rely on manufacturer representations regarding how far the automobile can travel on a single charge.

37.    Electric vehicles like the Bolt have important environmental and financial advantages over conventional vehicles with internal combustion engines. Significantly, all-electric vehicles do not produce any of the tailpipe emissions—such as nitrogen  oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that are produced by vehicles with internal combustion engines. The lack of tailpipe emissions means that electric vehicles theoretically help improve air quality, improve public health, and reduce the overall ecological damage caused by driving personal vehicles. This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants. In addition to the environmental benefits, in general, the cost of electricity to charge an electric vehicle is considerably less than the cost of fueling with gasoline or diesel.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

38.     Range and charging ability are two primary considerations of consumers that decide to purchase an electric vehicle. The 2017, 2018, and 2019 Bolt EV Owner's Manuals state that charging the Battery from a standard 120-volt AC electrical outlet for an hour would yield about 4–6 miles of driving range. If the Battery were completely depleted, it would take more than 50 hours to fully recharge at that rate. For this reason, many Bolt owners and lessees install "Level Two" 240-volt charging stations at their residences. Although faster, 240-volt chargers still provide only about 25 miles of driving range per hour of charging and take nearly 10 hours to fully charge from fully depleted. Necessarily, then, the distance one can drive on a fully-charged battery without stopping to recharge the battery (the "battery range" or "range") is one of the most critical factors to consider in purchasing any all-electric vehicle.

39.     GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging. Defendants have consistently made that same representation to consumers since they started marketing the Bolt to the general public. GM went to great lengths in its attempt to demonstrate a 238-mile range, including taking a Car and Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."

40.     This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric vehicle—the Tesla Model 3. Both vehicles advertised a range of over 200 miles on a single charge, making them some of the "first [electric vehicles] that could conceivably function as a family's lone car." The Model 3, however, advertised a significantly faster charging time than the Bolt—the Bolt's fastest charging option, the direct-current fast-charging capability, does not come

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

standard with the Bolt and costs consumers an extra $750, and the Bolt takes about twice as long to fast-charge as the Model 3.

41.     The Bolt's slower charging time, combined with limited access to charging stations, meant that consumers would not be able to make longer trips with the Bolt without significant planning. The inconvenience of charging combined with the slower charging time of the Bolt when compared to its direct competitors made every additional mile of the Bolt's range critically important to consumers.

42.     GM repeatedly emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV.

At the time of the 2017 Chevy Bolt's release, GM published a specifications sheet disclosing that the Vehicle was able to maintain a driving range of an estimated 238 miles. The accompanying "product information" fact sheet regarding the 2017 Bolt confirmed that it offered an estimated 238 miles of range. The same was true for the 2018 Chevy Bolt's release, in which GM published the same specifications sheet disclosing the Vehicle's 238-mile battery range, and further reiterated the 238-mile range on its product information fact sheet.

43.     GM further emphasized the range of the Bolt in a number of advertisements, like this ad from The Washington Post in June 2017, which prominently asks consumers to "begin a long-distance relationship, now":

PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1

2

3

4

5

6

7

8

9

10

11



12          44.     GM touted the Chevy Bolt's Battery as being "where it all starts," and

13   advertised an energy capacity of 60 kWh, which GM said allowed drivers to travel an EPA-

14   estimated 238 miles on a single full charge. An example of one such advertisement touting the

15   Bolt's battery capabilities appears below:

16

17

18

19   

20

21

22

23

24

25          GM also displayed the range in a commercial from 2017:

26

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624



45.     One of the Bolt's first three customers stated in a GM press release that it was "the range and technology" that attracted him to the Bolt. After making its initial deliveries of the 2017 Bolt to its very first customers at the end of 2016, GM issued a press release that quoted a California customer who replaced a competing electric car model: "The range and technology attracted me to the Bolt. . . . I look forward to the longer drives I can make compared to the [BMW] i3 that I owned."  For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements and press materials that it intended to be disseminated to consumers.  Despite GM's representations, the most critical aspect of the Bolt's much- lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without risking a catastrophic fire.

### C.     The Defective Battery Poses a Significant Safety Risk to Defective Vehicle Owners and Lessees.

46.     Lithium-ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge." However, these batteries also

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

have a well-documented history of fire issues. Safety concerns related to unexpected fires have been well documented—including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked in 2019—and are known to GM. Unfortunately, GM ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in spontaneous ignition.

### 1.    The Bolt Lithium-Ion Battery Is Defective.

47.    Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.

48.    In order to develop a battery that would deliver the advertised range, Defendants developed a battery with "new cell design and chemistry." The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging." According to Defendants, the Bolt uses "active thermal conditioning . . . to keep the battery operating at its optimum temperature, which results in solid battery life performance."

49.    The lithium-ion Batteries in the Defective Vehicles were produced at an LG Chem facility in Ochang, South Korea. An image of the Bolt's battery pack is displayed below:

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624



50.    The Bolt's battery is structured with the cells arranged "like books on a bookshelf, in groups." Each group of pouch cells is "stacked to make modules," which are "held together at the ends by long bolts." "The [battery] pack thermal management is regulated by sensing temperature via thermistors located at the ends of the modules" and the liquid coolant is distributed via channels at the base of the cell packs.

51.    GM repeatedly advertised this cell design and chemistry as delivering "a battery system with 160 kilowatts of peak power and 60 kilowatts hours of energy." However, GM was unable to achieve this result without endangering Plaintiffs and other drivers because the thermal management system was inadequate to prevent thermal runaway during charging.

52.    According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1

2          **2.      GM Knew About the Battery Defect.**

3          53.      After the release of the 2017 Bolt, drivers quickly began to experience issues

4     stemming from the Bolt's lithium-ion battery. Drivers experienced losses of propulsion while

5     driving the Vehicles—including experiencing a sudden inability to accelerate the Vehicle

6     while driving.  Multiple drivers experienced sudden drops in battery levels and loss of power

7     to their Vehicles, some while driving in dangerous conditions.

8          54.      In December 2016, shortly after launching the Bolt, GM issued Service Bulletin

9     PIC6239 informing dealers of a "Bolt EV (BEV2) High Voltage Battery Exchange and internal

10    Parts Process" that might require dealers to replace the Bolt's "Rechargeable Energy Storage

11    System (RESS)" (i.e., the Battery) or certain related components. This quality improvement

12    program listed steps to determine whether components of the high voltage battery pack needed

13    replacement.

14         55.      GM addressed the loss of propulsion issue caused by the Defective Battery in

15    a November 2017 customer satisfaction program bulletin:

16
17              Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition in which
                the cells within the battery pack have low voltage. This condition is related to the
18              state of charge of the cell group. Eventually, the difference in the state of charge of
                the cell groups (average vs. minimum) may exceed a threshold.
19

20         GM informed owners that when this condition occurs, the "high voltage battery pack"

21    must be replaced.

22
23         56.      By 2019, the issues with the lithium-ion batteries began to escalate when

24    consumers began experiencing vehicle fires when charging their vehicles to a full or near-full

25    charge. On information and belief, the same issue that causes the low-voltage condition in

26    certain cell groups can cause high-voltage conditions in certain cell groups in the Defective

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

Battery. This issue can cause dangerous overheating of the battery while charging, resulting in fires in the Defective Vehicles.  NHTSA has warned that the "affected vehicles' [battery] cell packs have the potential to smoke and ignite internally, which could spread to the rest of the vehicle and cause a structure fire if parked inside a garage or near a house" and that the vehicles "can catch fire even if they are turned off, parked, and disconnected from a charging unit."

57.    NHTSA has received numerous reports of fires in Defective Vehicles during or shortly after charging.   The first complaint of spontaneous fire from the Defective Vehicles was submitted to NHTSA on July 8, 2019:

> NHTSA ID Number: 11230072
>
> NHTSA Posting Date: July 8, 2019
>
> ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2) CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE FUMES FROM THE BURNING MATERIALS WAS SO THICK AND NOXIOUS IT PERMEATED OUR HOME, REQUIRING PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE COMPANY**.

58.    From July 20, 2020, to August 26, 2020, GM received at least four claims alleging that the Defective Vehicles' battery pack had caused a fire. GM identified more than



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

a dozen battery-related allegations of fire involving 2017–19 Bolt vehicles. GM's internal investigations (spanning from August-November 2020, according to GM) revealed that in at least five of those cases the fire was related to the battery. In four such cases, the fire occurred when the battery was highly charged just before the fire occurred.

59.     Despite evidence of fires resulting from charging the Bolt's batteries to 100%—and despite GM's apparent purchase of an affected Vehicle for investigative purposes and knowledge of the fires—a GM engineer gave an interview months after the first NHTSA complaints, saying that "[w]e engineered the battery system so that you can charge to 100% and maximize range. If you want maximum range, charge to 100%." GM actually encouraged Chevy Bolt owners and lessees to "top off your battery as much or as little as you like."

60.     As the numerous NHTSA complaints show, and as GM has admitted via its public statements about the recalls, this is untrue. The Defective Battery is at risk of catching fire at full or near full charge unless the Defective Vehicles are modified to deplete full battery capacity, significantly reducing the Vehicle range below the advertised 238-mile range that consumers were promised when they purchased or leased the Defective Vehicles.

**D.      GM issues Ineffective Recalls of the Defective Vehicles.**

**1.      November 2020 Recall.**

61.     On November 13, 2020, more than a year after the first known incident of fire in the Defective Vehicles, and more than four years after GM began manufacturing and distributing the Defective Vehicles, GM issued Recall N202311730. The recall covered all 2017-2019 Chevy Bolt EVs and warned that the vehicles' high voltage batteries "may pose a risk of fire when charged to full, or very close to full, capacity." Instead of completely recalling the Defective Vehicles to replace the dangerous batteries, GM's recall initially proposed an

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

"interim remedy" for the Defective Vehicles that would limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module:



GM mailed recall notices to Bolt owners and lessees in November 2020. Below is a copy of a follow-up notice received by consumers:

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

62.     GM also emailed a notice entitled "Important safety information regarding your Chevrolet Bolt EV" to Bolt owners and lessees in November 2020:



63.     GM notified consumers that dealerships would offer a software update to implement the interim remedy.  GM also instructed consumers how to reduce the Vehicle change settings themselves in order to limit the charging capacity to 90%, leading to a

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

reduction in range of at least 24 miles. GM also instructed consumers not to park their Vehicles in garages or carports until after they had implemented the software changes:

> We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90% and reduce the risk of fire.
>
> If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

64.     GM's interim remedy not only substantially limited the range of Defective Vehicles, but failed to prevent battery fires. For example, one 2018 Chevy Bolt owner had the interim remedy applied to his Vehicle on March 25, 2021. On May 1, 2021, his Vehicle experienced a battery fire at approximately 11:00 am while his car was parked inside the garage of his home, resulting in an estimated $235,000 worth of damage to his Vehicle and property. The Vehicle was not charging at the time, and prior to the battery fire it was "rarely used" and "[t]he owner did not charge to full often, if ever."

**2.     April 2021 "fix."**

65.     On April 29, 2021, GM announced a purported permanent "fix" for the Defective Batteries in the Defective Vehicles. GM's remedy consisted of a GM dealer tool to "identify potential battery anomalies and replace battery module assemblies as necessary" coupled with the installation of "advanced onboard diagnostic software into these [Defective]

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

Vehicles that … has the ability to detect potential issues related to changes in battery module performance before problems can develop":

> General Motors is notifying owners of select 2017-2019 model year Chevrolet Bolt EVs that it has developed a remedy to complete the previously announced safety recall.

> As part of the service procedure, dealers will utilize GM-developed diagnostic tools to identify potential battery anomalies and replace battery module assemblies as necessary. The remedy will also include the installation of advanced onboard diagnostic software into these vehicles that, among other things, has the ability to detect potential issues related to changes in battery module performance before problems can develop.

> Customers will need to visit their nearest participating Chevrolet Bolt EV dealer to have the remedy service procedure performed. When the vehicle is updated with the new software, the 90% state of charge limitation is removed, so that the battery is returned to its previous maximum charging capacity.

> Customers of 2019 model year Chevrolet Bolt EVs were able to have this remedy performed starting on April 29 and customers who own 2017 and 2018 model year Bolt EVs will be eligible to have the remedy performed starting May 26 at their preferred Chevrolet Bolt EV Dealer. We will also be making the advanced diagnostic software available to all other Bolt EV owners in the coming months. Additionally, we will be making this diagnostic software standard in the 2022 Bolt EV and EUV, as well as future GM electric vehicles.

66.    The new diagnostic software was "supposed to monitor the [battery] cells for voltage variations much more closely and often than before. The idea is to proactively look for the conditions or indications that could lead to a fire. This way they can either avoid them, or get the battery replaced before a fire occurs." If the software detected an abnormality, it advised the operator to take the Vehicle in for a battery swap.

67.    In addition, the software "also monitors the battery after the charge completes to look for abnormalities" and "if the car detects a 'thermal runaway' event (aka impending fire), it will blare the horn and flash the lights." Crucially, like GM's interim November 2020



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

remedy, the April recall did not cure the Defective Battery in the Defective Vehicles. Rather, it alerted operators of the Defective Vehicles that a battery fire may still occur or is occurring. The warning did nothing to prevent a runaway event, and in practical terms it was next to worthless as a warning of an impending fire.

68.     Like the interim November 2020 remedy, GM's April purported "fix" did not prevent battery fires. On July 1, 2021, Tim Briglin, a Vermont state legislator and owner of a 2019 Chevy Bolt, experienced a battery fire despite having GM's new diagnostic software installed on June 9, 2021.  A photo of the burned vehicle is below:



69.     Prior to receiving the purportedly permanent recall fix, Briglin followed GM's instructions and limited the charge of his Vehicle to 80% capacity and reported no other issues with his Vehicle. At the time he received the recall fix his Vehicle had only 38,264 miles on the odometer. After receiving the recall fix, he resumed charging his battery as instructed by GM.

70.     At least two more Vehicles spontaneously caught fire after receiving the April 2021 "fix." On July 14, 2021, GM released a new recommendation to Plaintiffs: park the Vehicles outside, "away from homes and other structures," immediately after charging, and

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

do not charge the Vehicles overnight. GM recommended this regardless of whether the Vehicle had had the interim or final recall remedy completed.

### 3.   July 2021 Recall and Safety Guidance.

71.    On July 23, 2021, GM announced Recall N212343880 for all 2017–19 Chevrolet Bolt vehicles, regardless of whether they had already had the previous recall(s) performed. GM announced that it would use software to check for potentially defective batteries and then replace them as needed.  Dealers would also install diagnostic software that would allegedly warn of impending fires.   In the meantime, GM imposed stringent restrictions on the charging and use of the 2017–19 Defective Vehicles: customers were to limit charging capacity to 90% and avoid depleting their battery below "approximately 70 miles of remaining range," instructions that resulted in a loss of range of more than 40%.  GM also instructed owners to "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight," inconveniencing their customers and rendering it difficult for them to charge their vehicles.

### 4.   August 2021 Recall.

72.    On August 17, 2021, GM announced Recall N212345940, which expanded the July 2021 recall to include roughly 9,000 previously excluded 2019 model year Defective Vehicles plus more than sixty-thousand 2020–22 model year Defective Vehicles. Once again, GM asked customers to limit charging capacity to 90%, to avoid depleting their battery below "approximately 70 miles of remaining range" and to "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight:"

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in 2020-22 model year Chevrolet Bolt EV and 2022 model year Chevrolet Bolt EUV vehicles. The high voltage batteries in some vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
|---|---|
| Correction | The remedy will be the replacement of defective battery modules in the recall population. Until the updated recall remedy is performed, customers should take the following interim steps:<br><br>1. Customers should set their vehicle's high-voltage battery system to a 90% state of charge limitation using Target Charge Level mode. If customers are unable to successfully make these changes, or do not feel comfortable making these changes, customers should visit their dealer to have these adjustments completed.<br><br>2. Additionally, we ask that customers charge their vehicle more frequently and avoid depleting their battery below approximately 70 miles (113 KM) of remaining range, where possible.<br><br>3. Out of an abundance of caution, customers should continue to park their vehicles outside immediately after charging and not leave their vehicles charging indoors overnight. |

GM admitted that it did not have a fix for the Vehicles at the time, stating that "we are working on a process to identify which modules are defect-free and which need to be replaced. Once we have a validated process, we will be able to replace only those modules that are actually defective."

73. GM mailed notices of the updated recall to owners and lessees of the Vehicles in August 2021 such as the following:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017 model year Chevrolet Bolt EV vehicles. As a result, GM is conducting a safety recall. We apologize for this inconvenience. However, we are concerned about your safety and continued satisfaction with our products.

**IMPORTANT**
- Your vehicle is involved in a new GM safety recall N212343880.
- Previously, you were notified that your vehicle is involved in GM recall N202311731. If you have not done so, you should visit your Chevrolet EV dealer to obtain the remedy for the previous recall, which includes an important software update and diagnostic check on the health of your vehicle's battery system.
- This letter contains important interim safety precautions that should be followed until the final recall remedy for new recall number N212343880 is performed on your vehicle.

**Why is your vehicle being recalled?** Certain vehicles were built with high voltage cells produced at LG Chem's Ochang, Korea facility that pose a risk of fire when charged to full, or very close to full, capacity. Experts from GM and LG have identified the simultaneous presence of two manufacturing defects in the same battery cell as the root cause of these battery fires.

**What will we do?** **Parts to repair your vehicle are not currently available,** but when parts are available, your Chevrolet dealer will replace the lithium ion battery modules in your vehicle with new lithium ion battery modules. This service will be performed for you at **no charge.**

We are working as quickly as possible to correct this condition. When parts are available, we will send you another letter asking you to take your vehicle to your Chevrolet dealer to have your vehicle serviced. You can also check the status of this recall at: https://my.gm.com/recalls.

PLAINTIFFS' COMPLAINT - Page 30

**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

| | |
|---|---|
| **What should you do?** | **While we prepare to conduct this recall, you should take the following interim steps:** |
| | 1. You should, whether or not your vehicle received the recall remedy in GM safety recall N202311731, return your vehicle to the 90% state of charge limitation using Hilltop Reserve mode (for 2017-2018 model years) or Target Charge Level (for 2019 model year) mode. If you are unable to successfully make these changes, or do not feel comfortable making these changes, visit your Chevrolet EV dealer to have these adjustments completed, **free of charge.** |
| | 2. Charge your vehicle more frequently and avoid depleting your battery below approximately 70 miles (113 KM) of remaining range, where possible. |
| | 3. **Continue to park your vehicle outside immediately after charging and do not leave your vehicle charging indoors overnight.** |
| | If you have not visited your dealer to receive the recall remedy in GM safety recall N202311731, you should visit your Chevrolet EV dealer to obtain this important software update, which includes a diagnostic check on the health of your vehicle's battery system. After obtaining the software update, you should still take the interim steps summarized above. When scheduling your appointment, confirm with the dealer that they are an EV certified dealer. |
| **Do you have questions?** | If you have questions or concerns that your dealer is unable to resolve, please contact the Chevrolet EV Concierge team at 833-EVCHEVY (833-382-4389). Hours of operation are Monday through Friday, 8:00 AM to 12:00 AM ET or Saturday and Sunday, 12:00 PM to 9:00 PM ET. |

If after contacting your dealer and the Chevrolet EV Concierge, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 21V560.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

Regina A. Carto

Regina A. Carto
Vice President
Global Product Safety and Systems

74.    In September 2021, GM announced further restrictions on owners and lessees of the Vehicles. In addition to the recall instructions, if owners or lessees needed to park in a parking lot or structure, GM now recommended "parking on the top floor or on an open-air deck and park[ing] 50 feet or more away from [other] vehicle[s]." GM repeated this advice to consumers on multiple forums.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

75.     In October 2021, GM issued Recall N212343881 covering all 2017-2019 Chevy Bolt EVs.

**Product Safety Recall**
N212343881 High Voltage Battery May Melt or Burn



| Make | Model | Model Year | | RPO | Description |
| --- | --- | --- | --- | --- | --- |
| | | From | To | | |
| Chevrolet | Bolt EV | 2017 | 2019 | | |

Involved vehicles are marked "Open" on the Investigate Vehicle History screen in GM Global Warranty Management system. This site should always be checked to confirm vehicle involvement prior to beginning any required inspections and/or repairs.

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017-2019 model year Chevrolet Bolt EV vehicles. The high voltage batteries in these vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
| --- | --- |
| Correction | Dealers will replace the lithium-ion battery pack in the vehicle. |

Pursuant to the Recall, GM dealers would "replace the lithium-ion battery pack" in the affected vehicles. That same month, GM announced Recall N212345941, which expanded the battery replacement recall to all 2020-2022 Chevy Bolt EVs and 2022 Chevy Bolt EUVs.

76.     Then, in December 2021, GM announced Recall N212345940-01, a revision to Recall N212345940. The recall applied to all 2020-2022 Chevy Bolt EVs and 2022 Chevy Bolt EUVs. The recall claimed that GM had developed new diagnostic software that would limit the vehicle's maximum charge to 80% and would remove some of the prior charging and use limitations. Even if true, the new recall would lead to a decrease in range of more than 20%.

77.     Finally, in June 2023, GM issued Recall N212345944 and Recall N212345945. The recalls applied to most 2020-2022 Chevy Bolt EVs and 2022 Bolt EUVs. The recall informed Bolt owners that GM would install advanced diagnostic software that would limit the Defective Batteries to a maximum state of charge of 80%. If no anomalies were detected by the software after 6200 miles of use, the battery would return to 100%. If problems were the detected, battery would be replaced:

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2020-2022 model year Chevrolet Bolt EV, and 2022 model year Chevrolet Bolt EUV vehicles. The high voltage batteries in these vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
|-----------|---|
| Correction | Dealers are to install the advanced diagnostic software that will monitor battery performance and identify defective battery modules that require replacement. |

GM issued a Notice to Consumers that explained the terms of the recall:

**Safety Recall**
N212345945 High Voltage Battery May Melt or Burn (GM Owned Vehicles)

# NOTICE TO CUSTOMER

This vehicle is now updated with a new advanced diagnostic software that will continually monitor the high voltage battery.   If the software detects a problem in your vehicle's high voltage battery, you will be alerted via a warning in the driver information center. If this occurs, you should contact your Chevrolet Bolt EV/EUV certified dealer to have the affected high voltage battery module replaced.

The software will initially limit your vehicle's high voltage battery to a maximum state-of-charge of 80%.  If no anomalies are detected after **approximately** 6,200 miles or 10,000 km of use, the high voltage battery will automatically return to a maximum state-of-charge of 100% without a return trip to the dealer.  After this occurs, the software's advanced diagnostics will continue to monitor your vehicle's high voltage battery system.

78.     As part of the June 2023 recall, GM also informed owners that until they received the new software or a new battery, they should continue to limit charging to 90%, not allow the battery range to get below 70 miles, park their vehicle outside after charging and not charge their vehicles indoors overnight:

PLAINTIFFS' COMPLAINT -  Page 33

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

If you have not been able to visit your local dealer for a software update or lithium-ion battery module replacement, we ask that you continue to follow these steps:

1. Set your vehicle to a 90 percent state of charge limitation using Hilltop Reserve mode (for 2017-2018 model years) or Target Charge Level mode (for 2019-2022 model years). Instructions on how to do this are available in the videos below. If you are unable to successfully make these changes, or do not feel comfortable making these changes, please visit your Chevrolet dealer to have these adjustments completed.

2. Charge your vehicle more frequently and avoid depleting your vehicle battery to below approximately 70 miles (113 kilometers) of remaining range, where possible.

3. Park your vehicle outside immediately after charging and do not leave your vehicle charging indoors overnight.

79.     Despite GM's multiple recalls, Plaintiffs are now left with vehicles that cannot reach the advertised range, that they cannot charge at convenient times or locations, and that may spontaneously burst into flames, causing serious harm to the vehicle and its owners, lessees and occupants.  Plaintiffs were also deprived of the benefit of their bargain in purchasing or leasing their Defective Vehicles.

80.     Defendants have been unable to develop, implement, and deliver a repair that relieves consumers from their current unsafe and unacceptable circumstances. Even if they could do so tomorrow, Plaintiffs would still have suffered economic harm. Had Defendants disclosed the Vehicles' true characteristics, consumers would have paid much less for the Vehicles, if they would have bought or leased them at all. This means that Plaintiffs overpaid for the Defective Vehicles at the time of purchase.  Consumers who drove their Vehicles less frequently because of range anxiety, range limitations, inconvenient charging, or other reasons related to the defects also lost the benefits of use and the option for use, while their Vehicles still depreciated as they aged.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

81.    Lower performance, inferior performance capability, such as range limits, safety hazards, mitigation costs, and reduced value are all attributable to the defect and diminish the value of Plaintiffs' ownership experience, for reasons attributable to the unreasonable and undisclosed Battery Defects. As a result, Plaintiffs have suffered economic harm. Even a full and complete repair today, were one possible, would only terminate some of those injuries. It would not remedy harm that Plaintiffs have already suffered and will suffer in the future.

### IV.    CAUSES OF ACTION
### First Cause of Action: Breach of Express Warranty
### (RCW 62A.2-313 and 62A.2A-210))

82.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

83.    Plaintiffs were "buyers" of the subject vehicles under RCW 62A.2-103.

84.    GM was a "seller" of the subject vehicles under RCW 62A.2-103.

85.    The subject vehicles constitute "goods" under RCW 62A.2-105.

86.    Plaintiffs' purchase or lease of the subject vehicles was accompanied by express warranties as defined in UCC Sections 2-313 and/or 2A-210 written and otherwise offered by Defendant, whereby said warranties were part of the basis of the bargain of upon which Plaintiffs relied.   Specifically, Defendant provided all purchasers and lessees of the Defective Vehicles with an express written warranty that covered the Vehicles, including but not limited to the battery, and Defendants warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease.  Defendants also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1     correct defects in materials or workmanship which occurred during the first 8 years or 100,000

2     miles, whichever came first. These express warranties became part of the basis of the parties'

3     bargain. Accordingly, Defendant's warranties are express warranties under the UCC.

4

5             87.      The vehicles were not as warranted and represented in that the vehicles have the

battery defects or conditions described above, as well as defects or conditions as reflected in

6     the various repair orders, technical service bulletins, special service messages, recall documents

7

8     and consumer complaints in possession of Defendant.

9             88.      As a result of the battery defect, the subject vehicle cannot be reasonably relied

10    on by Plaintiffs for the ordinary purpose of safe, reliable and efficient transportation.

11            89.      Plaintiffs have provided the Defendants with sufficient opportunities to repair or

12    replace the subject vehicles. Plaintiffs have reasonably met all obligations and pre-conditions

13    as provided in the express warranty.

14

15           90.      Defendant has breached the express warranties by failing to adequately repair

16    the subject vehicles and/or have not repaired the subject vehicles in a timely fashion, and the

17    vehicles remain in a defective condition. Defendants sold and leased the Defective Vehicles

18    with the Defective Batteries, requiring repair or replacement within the applicable warranty

19    periods, and refused to honor the warranties by providing free repairs or replacements during the

20    applicable warranty periods sufficient for the Defective Vehicles to be restored to their

21    advertised qualities within a reasonable time.

22

23           91.      The subject vehicles continue to contain defects that substantially impair the use,

24    safety and value of the vehicles. These defects and non-conformities could not reasonably

25    have been discovered by Plaintiffs prior to Plaintiffs' acceptance of the subject vehicle.

26

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

92.    As a result of Defendant's breaches of express warranties, Plaintiffs have suffered damages within the jurisdictional limits of this Court in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

93.    Plaintiffs each notified Defendants of their breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure their breaches would have been futile.  *See*, *e.g.*, *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 976 (E.D. Mich. 2022) ("The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair. Plaintiffs have made the sort of representations the Gregorio court suggested would be sufficient: that there is a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation that GM offered were insufficient.").

94.    In any event, Defendants know about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendants were provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, and directly from consumers, including Plaintiffs.

95.    Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because Defendants knowingly sold a defective product to Plaintiffs.   The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Plaintiffs. Among other things, Plaintiffs had no

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Plaintiffs because Defendants knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

96.     Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

97.     Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

**Second Cause of Action:**
**Breach of Express Warranty-Magnuson Moss Warranty Act**

98.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

99.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). The Defective Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

100.     Plaintiffs' purchase or lease of the subject vehicles was accompanied by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, Defendants provided all purchasers and lessees of the Defective Vehicles with an express written warranty that covered the Vehicles, including but not limited to the battery, and Defendants warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. Defendants also warranted that the Defective Vehicles' high voltage battery pack was free of defects in

PLAINTIFFS' COMPLAINT - Page 38

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship which occurred during the first 8 years or 100,000 miles, whichever came first.

101.    The vehicles were not as warranted and represented in that the vehicles have the battery defects or conditions described above, as well as defects or conditions as reflected in the various repair orders, technical service bulletins, special service messages, recall documents and consumer complaints in possession of Defendant.

102.    As a result of their many defects, the subject vehicle cannot be reasonably relied on by Plaintiffs for the ordinary purpose of safe, reliable and efficient transportation.

103.    Plaintiffs have provided the Defendants with sufficient opportunities to repair or replace the subject vehicles. Plaintiffs have reasonably met all obligations and pre-conditions as provided in the express warranty. Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

104.    Defendant has breached the express warranties by failing to adequately repair the subject vehicles and/or have not repaired the subject vehicles in a timely fashion, and the vehicles remain in a defective condition. Defendants sold and leased the Defective Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refused to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Defective Vehicles to be restored to their advertised qualities within a reasonable time.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

105.    The subject vehicles continue to contain defects that substantially impair the use, safety and value of the vehicles.  These defects and non-conformities could not reasonably have been discovered by Plaintiffs prior to Plaintiffs' acceptance of the subject vehicle.

106.    As a result of Defendant's breaches of express warranties, Plaintiffs have suffered damages within the jurisdictional limits of this Court in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

107.    Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because Defendants knowingly sold a defective product to Plaintiffs.   The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Plaintiffs. Among other things, Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and the Plaintiffs because Defendants knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

108.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

**Third Cause of Action:**
**Breach of Implied Warranty**
**<u>of Merchantability (RCW 62A.2-314)</u>**


PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1    109.    GM was a "merchant" of the subject vehicles under RCW 62A.2-104.

2    110.    The subject vehicles constitute "goods" under RCW 62A.2-105.

3    111.    The subject vehicles were subject to implied warranties of merchantability

under UCC Sections 2-314 and/or Section 2A-212 as well as RCW 62A.2-314.

112.    Defendant provided Plaintiffs with an implied warranty that the Defective

Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which

they were sold. Defendant impliedly warranted that the Defective Vehicles were of

merchantable quality and fit for such use. This implied warranty included, among other things:

(i) a warranty that the vehicles were safe and reliable for providing transportation, and would

not experience premature and catastrophic failure; and (ii) a warranty that the Defective

Vehicles would be fit for their intended use while being operated.

113.    The Defective Vehicles were and are not fit for their ordinary purpose of

providing reasonably reliable and safe transportation at the time of sale or thereafter because

the Defective Battery can manifest and result in spontaneous ignition and fire when fully or

nearly fully charged and are therefore not safe to operate. *In re Chevrolet Bolt EV Battery Litig.*,

633 F. Supp. 3d 921, 979 (E.D. Mich. 2022) ("The alleged fire-risk defect clearly constitutes a

serious safety defect, and is enough to render a vehicle unmerchantable."). In addition, the

Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably

reliable and convenient transportation at the time of sale or thereafter because the restrictions

placed on the use and charging of Defective Vehicles severely compromised their range and

the ease of charging the vehicles. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921,

976 (E.D. Mich. 2022) ("GM's required recall 'drastically reduc[ed]' the Bolt's mileage range.

GM concedes that the recall could impose a 'roughly 40% reduction' in range. Cutting the range

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

of a vehicle by nearly half—particularly a vehicle that takes hours to recharge, rather than mere minutes at a gas station and cannot be charged overnight due to the very defect in question—is enough to render a vehicle unmerchantable.")

114.    Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

115.    Defendant failed to adequately remedy the transmission defects in the subject vehicles within a reasonable time, and the vehicles continue to be in unmerchantable condition at the time of filing this Complaint.

116.    Privity is not required because Plaintiffs were intended third-party beneficiaries of the contracts between GM and its authorized dealers and were intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the subject vehicles, and the implied warranties were intended to benefit the ultimate consumers only.

117.    Plaintiffs are entitled to relief under the UCC and Washington statutes because Defendants' breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.  Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**<u>Fourth Cause of Action:</u>**
**<u>Breach of Implied Warranty-Magnuson Moss Warranty Act</u>**

118.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). The Defective Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

119.    Defendant provided Plaintiffs with an implied warranty under 15 U.S.C. §

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1    2301(7) that the Defective Vehicles, and any parts thereof, are merchantable and fit for the

2    ordinary purposes for which they were sold. Defendant impliedly warranted that the Defective

3    Vehicles were of merchantable quality and fit for such use. This implied warranty included,

4    among other things: (i) a warranty that the vehicles were safe and reliable for providing

5    transportation, and would not experience premature and catastrophic failure; and (ii) a warranty

6    that the Defective Vehicles would be fit for their intended use while being operated.

7    120.    The Defective Vehicles were and are not fit for their ordinary purpose of

8    providing reasonably reliable and safe transportation at the time of sale or thereafter because

9    the Defective Battery can manifest and result in spontaneous ignition and fire when fully or

10   nearly fully charged and are therefore not safe to operate. *In re Chevrolet Bolt EV Battery Litig.*,

11   633 F. Supp. 3d 921, 979 (E.D. Mich. 2022) ("The alleged fire-risk defect clearly constitutes a

12   serious safety defect, and is enough to render a vehicle unmerchantable."). In addition, the

13   Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably

14   reliable and convenient transportation at the time of sale or thereafter because the restrictions

15   placed on the use and charging of Defective Vehicles severely compromised their range and

16   the ease of charging the vehicles. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921,

17   976 (E.D. Mich. 2022) ("GM's required recall 'drastically reduc[ed]' the Bolt's mileage range.

18   GM concedes that the recall could impose a 'roughly 40% reduction' in range. Cutting the range

19   of a vehicle by nearly half—particularly a vehicle that takes hours to recharge, rather than mere

20   minutes at a gas station and cannot be charged overnight due to the very defect in question—is

21   enough to render a vehicle unmerchantable.").

22   121.    Plaintiffs provided Defendant with notice of its breaches of warranty within a

23   reasonable time after they discovered or should have discovered such breaches.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

122.    Defendant failed to adequately remedy the transmission defects in the subject vehicles within a reasonable time, and the vehicles continue to be in unmerchantable condition at the time of filing this Complaint.

123.    Privity is not required because Plaintiffs were intended third-party beneficiaries of the contracts between GM and its authorized dealers and were intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the subject vehicles, and the implied warranties were intended to benefit the ultimate consumers only.

124.    Plaintiffs are entitled to relief because Defendant's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.  Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**Fifth Cause of Action:**
**Violations of the Consumer Protection Act**
**(RCW 19.86.010, et. seq.)**

125.    Plaintiffs incorporate by reference herein the foregoing paragraphs.

126.    Plaintiffs are "persons" under RCW 19.86.010.

127.    Defendant was engaged in "trade" and "commerce" with respect to the subject vehicles as those terms are defined in RCW 19.86.010.

128.    Washington's Consumer Protection Act (the "Act") prohibits the "unfair or deceptive acts or practices on the conduct of any trade or commerce."  RCW 19.86.020.

129.    GM engaged in false, misleading, deceptive, and unfair acts and practices by representing that the Subject Vehicles had a 200-mile electric range, which they did not have unless charged to an unsafe and dangerous level which could lead to a fire.  GM further engaged

PLAINTIFFS' COMPLAINT -  Page 44



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

in false, misleading, deceptive, and unfair acts and practices by failing to inform Plaintiffs and others of the Subject Vehicles' serious battery defect.  GM was aware of the battery defect at the time it marketed and sold the Subject Vehicles to Plaintiffs and failed to disclose this material fact to Plaintiffs.

130.    GM intended that Plaintiffs rely on GM's false, misleading, deceptive, and unfair acts and practices in purchasing the Subject Vehicles.  Had Plaintiffs been aware of the true facts, they would not have purchased the Subject Vehicles or would have paid substantially less for them.  By purchasing the Subject Vehicles at the prices they paid, Plaintiffs suffered injuries and actual damages as a result of their justifiable reliance on GM's false, misleading and deceptive acts and practices, including but not limited to overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.

131.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. Plaintiffs seek an award of their actual damages along with appropriate punitive or exemplary damages, all reasonable and necessary attorneys' fees and costs of court.

132.    Defendant's violations entitle each Plaintiff to their costs, attorney fees, and damages, including treble damages, in an amount to be determined at trial.  *See* RCW 19.86.090 RCW 19.86.093.  Plaintiffs are also entitled to both pre-judgment and post-judgment interest.

133.    Pursuant to RCW 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

### Sixth Cause of Action:
### Fraud by Concealment

134.    Plaintiffs incorporate by reference herein the foregoing paragraphs.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

135.    Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to their customers the true nature of the defective batteries, which was not readily discoverable until years after they purchased or leased the subject vehicles. Defendants also failed to disclose that the advertised range of the subject vehicles could not be reached safely and without risk of a battery fire. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

136.    Defendant had superior knowledge of, and was in exclusive control of, the foregoing material facts and such facts were not known to the general public or to Plaintiffs or readily ascertainable by them.  Defendant actively and intentionally suppressed and concealed the foregoing material facts in order to induce Plaintiffs and others to purchase the subject vehicles at the advertised prices.

137.    Defendant was also under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

138.    In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant, who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiffs. The facts Defendants omitted from their representations were material because they directly impacted the subject vehicles' safety and reliability.

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

139.    Plaintiffs were unaware of the true facts regarding the subject vehicles and would not have acted as they did had they known of the suppressed and concealed facts. Plaintiffs justifiably relied on Defendant's omissions and were damaged as a result.

140.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

141.    As a result of Defendant's acts of fraud by concealment, Plaintiffs seek an award of their actual damages along with appropriate punitive or exemplary damages, all reasonable and necessary attorneys' fees and costs of court.

## V.    ATTORNEYS' FEES

142.    Plaintiffs seek all reasonable and necessary attorneys' fees in this case, which include the following:

a.      preparation and trial of this lawsuit;

b.      post-trial, pre-appeal legal services; and

c.      an appeal to the Ninth Circuit Court of Appeals.

## VI.    CONDITIONS PRECEDENT

143.    All notices and other conditions precedent to Plaintiffs' right to recover herein have been performed or have occurred.

### VII.    <u>JURY DEMAND</u>

144.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter and tender the proper jury fee with the filing of this petition.

PLAINTIFFS' COMPLAINT -  Page 47



1

## VIII.  <u>CONCLUSION AND PRAYER</u>

2

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that

3

Defendant be cited to appear and answer herein, and that upon final trial, they recover

4

against Defendant as follows:

5

1) On their first claim for relief against Defendant General Motors for violations of

6
7

RCW 62A.2-313 and 62A.2A-210:

8

a. Damages in an amount to be determined by the jury; and

9

b. Attorney's fees and costs.

10

2) On their second claim for relief against Defendant General Motors for violations of

11

the Magnusson-Moss Warranty Act (Express Warranty):

12

a. Damages in an amount to be determined by the jury;

13

b. Statutory damages as determined by the Court; and

14

c. Attorney's fees and costs.

15

16

3) On their third claim for relief against Defendant General Motors for violations of

17

RCW 62A.2-314:

18

a. Damages in an amount to be determined by the jury; and

19

b. Attorney's fees and costs.

20

21

4) On their fourth claim for relief against Defendant General Motors for violations of

22

the Magnusson-Moss Warranty Act (Implied Warranty):

23

a. Damages in an amount to be determined by the jury;

24

b. Statutory damages as determined by the Court; and

25

c. Attorney's fees and costs.

26

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

5) On their fifth claim for relief against Defendant General Motors for violations of The Washington Consumer Protection Act:

    a.  Damages in an amount to be determined by the jury;

    b.  Treble damages for each and every violation as authorized by RCW 19.86.090;

    c.  Available pre-judgment ant post-judgment interest where applicable; and

    d.  Attorney's fees and costs

6) On their sixth claim for relief against Defendant General Motors for violations of Fraud by Concealment:

    a.  Damages in an amount to be determined by the jury;

    b.  Attorney's fees and costs.

7) On All Claims for Relief, costs and expenses incurred in this action; and

8) For such other relief that the Court deems appropriate.

SIGNED this 15th day of December, 2023.

PFAU COCHRAN VERTETIS AMALA, PLLC

By: /s/ Michael T. Pfau
Michael T. Pfau, WSBA No. 24649
michael@pcvalaw.com

By: /s/ Christopher E. Love
Christopher E. Love, WSBA No. 42832
chris@pcvalaw.com

HEYGOOD, ORR & PEARSON

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624

1

2

3

By: /s/ Eric D. Pearson
Eric D. Pearson (pro hac vice admission pending)
Texas State Bar No. 15690472
eric@hop-law.com

4

5

6

By: /s/ Charles R. Miller
Charles R. Miller (pro hac vice admission pending)
Texas State Bar No. 24007677
charles@hop-law.com

7

*Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
701 Fifth Avenue, Suite 4300
Seattle, WA 98104
(206) 462-4334 | Fax: (206) 623-3624